UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 4:22-mc-10086-KMM

IN RE: SUBPOENA SERVED ON
R. JOYCE GRIFFIN, *Supervisor of*
*Elections for Monroe County, Florida*.
_____/

R. JOYCE GRIFFIN, *Supervisor of*
*Elections for Monroe County, Florida*,

    Movant,

v.

MYPILLOW, INC. and
MICHAEL LINDELL,

    Respondents.
_____/

## ORDER[1]

**THIS CAUSE** is before the Court upon the Motion to Quash Rule 45 Subpoena and Incorporated Memorandum of Law (ECF No. 1), filed by Movant R. Joyce Griffin, Supervisor of Elections for Monroe County, Florida ("Movant" or the "Supervisor"). Respondents Michael J. Lindell ("Lindell") and My Pillow, Inc. ("My Pillow") (collectively, "Respondents") filed an Opposition to Motion to Quash (ECF No. 13); Movant did not file a reply, and the time to do so has passed. The Motion (ECF No. 1) was referred to the undersigned by the Honorable K. Michael Moore, United States District Judge, to take all necessary and proper action as required by law and/or to issue a Report and Recommendation (ECF No. 4). I convened a hearing on the Motion

---

[1] Because a motion to quash a subpoena under Federal Rule of Civil Procedure 45 is non-dispositive, I dispose of the instant Motion by Order rather than by Report and Recommendations. *See Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1328 (11th Cir*.), cert. denied sub nom. Jordan v. Georgia Dep't of Corr.*, 141 S. Ct. 251 (2020).

1

on November 2, 2022, in Key West, Florida. Having considered the Motion, the Response, the record as a whole, and with the benefit of the Parties' positions advanced at oral argument, the Motion (ECF No. 1) is **GRANTED, in part,** as further set forth below.

I.   BACKGROUND

This action arises from an out-of-district subpoena directed to the Supervisor of Elections for Monroe County, Florida (the "Subpoena") (ECF No. 22-1),[2] issued in connection with *US Dominion, Inc. et al. v. My Pillow, Inc. et al.*, Case No. 1:21-cv-00445-CJN (D.D.C.), which is currently pending in the United States District Court for the District of Columbia (the "District of Columbia Case").

The District of Columbia Case is an action for defamation brought by plaintiffs US Dominion and its subsidiaries (collectively, "Plaintiffs"), against defendants My Pillow and its CEO, Michael Lindell, who are Respondents in the instant proceeding.[3] Plaintiffs, who are manufacturers of vote tabulation systems used in elections throughout the country, set out in their complaint that My Pillow and Lindell promoted then-President Donald J. Trump's election-related claims (that the 2020 U.S. presidential election had been stolen from him) to boost their My Pillow product sales among audiences watching certain news outlets, knowing these claims to be false.[4]

According to Plaintiffs, Lindell published the false statement that Plaintiffs, through an algorithm encoded in their election vote tabulation systems by hacking, caused the 2020 U.S. presidential election to be rigged. Specifically, Plaintiffs point to Lindell's persistent publication of claims that algorithms in Plaintiffs' vote tabulation machines overcounted votes for now-

---

[2] The Subpoena was initially filed as Docket Entry 1-1.
[3] *See generally Dominion, Inc. et al. v. My Pillow, Inc. et al.*, Case No. 1:21-cv-00445-CJN, ECF No. 1 (D.D.C. 2021).
[4] The District of Columbia Case's complaint describes the various rallies and events at which Lindell purportedly published false statements that Plaintiffs' vote tabulation machines rigged the 2020 U.S. presidential election, and the marketing exposure My Pillow received in connection with those rallies and events.

incumbent President Joseph R. Biden, and undercounted votes for then-President Trump, such that each vote for President Biden counted as approximately 1.2 votes, and each vote for President Trump counted as approximately 0.7 votes.

However, Plaintiffs assert that these claims have been resoundingly discredited and rejected in numerous courts, by various agencies of the Federal government, by election officials in numerous states, and by election specialists. According to Plaintiffs, the evidence defendants and others have put forward to substantiate their claims (that the 2020 election was stolen) was manufactured, speculative, untrustworthy, and cherry-picked. Plaintiffs allege that Lindell and others (including attorneys Sidney Powell and L. Lin Wood), nonetheless continued to publish that Plaintiffs' vote tabulation machines, allegedly hacked so as to encode the algorithm described above, caused the 2020 presidential election to be stolen in favor of President Biden.

Plaintiffs assert that they sent retraction demand letters to Lindell's allies, including attorney Sidney Powell, and to various media organizations, including One America News Network, Newsmax, and *The Epoch Times*. Plaintiffs aver that the retraction letters received significant media attention, and thus Lindell was likely aware of the letters' contents. And, on December 23, 2020, Plaintiffs sent Lindell a letter demanding that he stop making false claims about Plaintiffs. However, Plaintiffs contend that, as a means of promoting My Pillow's products, Lindell nonetheless continued to publish false statements, on Twitter, at political rallies, and elsewhere, that the 2020 U.S. presidential election was rigged by algorithms in Plaintiffs' vote tabulation machines that overcounted votes for President Biden and undercounted votes for President Trump.

On January 8, 2021, Plaintiffs sent Lindell another retraction letter, pointing to information and evidence in the public domain (and further summarized in Plaintiffs' complaint in the District

of Columbia Case) allegedly demonstrating the falsity of Lindell's statements about Plaintiffs' vote tabulation machines. Plaintiffs contend in their complaint that, nonetheless, Lindell continued, on Twitter and on television, to publish his false election-related claims as a means of selling more My Pillow products. Plaintiffs assert that Lindell attempted to prove up his claims, pointing to a non-credible report and allegedly fraudulent data manufactured by obviously discreditable conspiracy theorists. Plaintiffs' complaint details the ways in which the report and data cited by Lindell are false. Yet, as further set out in Plaintiffs' complaint, certain news organizations continued to afford Lindell a global platform to publish his election-related claims because those organizations relied on Respondents' advertising and marketing fees.

Plaintiffs contend that, after the inauguration of President Biden on January 20, 2021, Lindell continued to publish his claim that Plaintiffs' vote tabulation machines contained an algorithm that caused the 2020 presidential election to be stolen. When Lindell and My Pillow were later banned from Twitter as a result, Lindell continued to advance this claim through interviews on television programs that wanted to continue to receive My Pillow advertising fees.

In their complaint, Plaintiffs assert that, on February 4, 2021, they again put the defendants on notice of the falsity of their statements, pointing the defendants to the alleged flaws in the report and data that the defendants had used to support their election-related claims. In response, the defendants asserted, in television interviews, that they were being targeted by Plaintiffs. The next day, and after having been put on notice by Plaintiffs regarding the alleged falsities of his statements, Lindell broadcasted a purportedly sham documentary-style movie, which is described in greater detail in the complaint. Plaintiffs contend that, apart from promoting My Pillow's products in that movie, Lindell knowingly lied that the discredited report and allegedly manufactured data obtained from conspiracy theorists both were proof that the 2020 presidential

4

election had been stolen, due to algorithms hacked into Plaintiffs' vote tabulation machines.

According to Plaintiffs, Lindell's claims regarding Plaintiffs' vote tabulation machines enriched him and My Pillow at Plaintiffs' expense. As further alleged in the complaint, Respondents' defamatory marketing campaign against Plaintiffs led to a more than 30-to-40 percent increase in sales at My Pillow. In contrast, Plaintiffs contend that they have suffered reputational and financial harm, projected in the amount of $200 million over the next five years, as a result of Lindell and My Pillow's allegedly defamatory marketing campaign. Due to death threats and other threatening messages prompted by Lindell's election-related claims, Plaintiffs assert that they have had to increase their security expenditures. Plaintiffs also contend that state legislators in various states that use Plaintiffs' vote tabulation machines have expressed their intent to reconsider or review long-term contracts; Plaintiffs claim their ability to win new contracts has also been put in jeopardy.

Accordingly, Plaintiffs assert causes of action against defendants for defamation *per se* and for deceptive trade practices, under Minnesota law.

On September 7, 2022, Respondents served the Subpoena on the Supervisor, commanding production of 22 different categories of information related to the voting system used by Monroe County, Florida during the 2020 U.S. presidential election. The requested information includes forensic copies of all computer drives affiliated or attached to the Supervisor's vote tabulation system, forensic copies of certain files generated by the vote tabulation systems, diagrams of the Supervisor's computer networks running the election system, MAC addresses for election equipment, network logs, credentials for encryption services used by the election system, lists of personnel who had access to the election system before and shortly after the November 2020 presidential election, vote tabulation documents generated during the November 2020 election,

documents produced in relation to the November 2020 election, documents related to intrusion attempts on the election system, contracts and agreements with the supplier of the election system, and contracts and agreements related to network security and cybersecurity.

Now, the Supervisor moves to quash the Subpoena, pursuant to Federal Rule of Civil Procedure 45(d)(3).[5]

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 45, a party to an action may command a non-party to produce documents, electronically stored information, or tangible things at a place within 100 miles of where that non-party resides, is employed, or regularly transacts business in person. Fed. R. Civ. P. 45(c)(2)(A). However, a party serving a non-party with a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Rule 45 permits a subpoenaed non-party to file objections to requested discovery. Fed. R. Civ. P. 45(d)(2)(B). Such objections are due "before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B)(i).

A subpoenaed non-party may also move to quash a subpoena directed to her. Fed. R. Civ. P. 45(d)(3). A court in the district where compliance is required must quash or modify a subpoena that "(i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). Moreover, a court may modify or quash a subpoena where the subpoena would require "(i) disclosing a trade secret or other confidential research, development, or commercial

---

[5] In the alternative, the Supervisor seeks a protective order extending the time to produce documents responsive to Requests 4(a), 4(b), 7, and 8, subject to the Supervisor being compensated for the expense associated with that production.

6

information; or (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B).

Though Rule 45 does not explicitly recognize a motion to quash based on irrelevancy or overbreadth, courts consider the scope of discovery under a subpoena as the same as the scope of discovery under Rule 26. *Jordan*, 947 F.3d at 1329; *Am. Fed'n of State, Cnty. & Mun. Employees (AFSCME) Council 79 v. Scott*, 277 F.R.D. 474, 476 (S.D. Fla. 2011). In turn, under Rule 26(b), parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). In this respect, "a subpoena issued under Rule 45 should be quashed to the extent it seeks irrelevant information."[6] *Jordan*, 947 F.3d at 1329.

## III. DISCUSSION

The Supervisor seeks to quash the Subpoena on three grounds. First, the Supervisor argues that compliance with the Subpoena constitutes a threat to the cybersecurity of the election system in Monroe County. According to the Supervisor, Respondents seek the production of information (network diagrams, MAC addresses, IP addresses, and credentials) that would permit the infiltration of Monroe County's voting system; the Supervisor contends that production of this information would constitute a security breach in violation of 6 U.S.C. §§ 1501–1510 and Florida Statutes § 212.318, and there is a significant risk that the information would be publicly disclosed even if subject to a protective order. Moreover, the Supervisor asserts that the information sought

---

[6] "Relevance in the context of discovery 'has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Akridge v. Alfa Mut. Ins. Co.*, 1 F.4th 1271, 1276 (11th Cir. 2021) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). It is well-established that information need not be admissible in evidence for it to be discoverable. *See* Fed. R. Civ. P. 26(b)(1).

7

is protected from disclosure under Florida Statutes § 119.0725.  And, the Supervisor contends that the information sought constitutes "other protected matter" requiring that the Subpoena be quashed, under Rule 45(d)(3)(A)(iii).

Second, the Supervisor argues that the Subpoena should be quashed because it seeks production of confidential and proprietary trade secrets.  Specifically, the Supervisor contends that the information sought constitutes trade secrets under Florida law and that the information, particularly the source code and associated documentation, is otherwise confidential pursuant to the Voting System Agreement between the Supervisor and Plaintiffs.  Accordingly, the Supervisor asserts that production of documents requested in Requests 1(a)–(h), 2(a)–(b), 3(a), and 3(c) would require the Supervisor to violate the Voting System Agreement.

Third, the Supervisor argues that Subpoena should be quashed because compliance would impose an undue burden on the Supervisor.  Specifically, the Supervisor argues that the Subpoena is unduly burdensome because the Supervisor is a non-party; the Subpoena covers an extensive time span, with four of the requests being "unlimited" in scope; the Subpoena calls for production of documents and materials, the creation of which is beyond the scope of the Supervisor and her staff's expertise (*e.g.*, forensic images); and compliance with the Subpoena will require hundreds of hours of work and will be unduly expensive.  Last, the Supervisor argues that disclosure of the requested materials would likely require that the Monroe County voting system be replaced.

Notwithstanding, at the November 2, 2022 hearing, the Parties appeared to confirm that the instant dispute centers on Respondents' request for documents and information responsive to Requests 1 through 3.[7]  Upon weighing the relevant factors, the Court finds that, with respect to

---

[7] Counsel for the Supervisor represented that: (1) the Supervisor objects only as to timing for Requests 4(a) and 4(b) and is amenable to conferring on a narrowed production for Request 4(c); (2) there are no documents responsive to Requests 5, 6, and 8; and (3) the Supervisor satisfied Request 7 by attaching a copy of the Voting System Agreement to the Motion to Quash.  Respondents offered no objection to an extension of 8–10 weeks for the Supervisor to produce

Requests 1 through 3, the Subpoena must be quashed, as unduly burdensome.[8]

### A. Factors Applicable

The burden of proof in demonstrating that compliance with a subpoena presents an undue burden lies with the party opposing the subpoena, while the party seeking to enforce a subpoena bears the burden of demonstrating that the request is relevant. *Fadalla v. Life Auto. Products, Inc.*, 258 F.R.D. 501, 504 (M.D. Fla. 2007). To determine whether a subpoena imposes an undue burden, the Court must balance the requesting party's need for the discovery against the burden imposed upon the subpoenaed party. *Id.* Courts consider the following factors in this analysis: "(1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed." *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004) (citing *Williams v. City of Dallas*, 178 F.R.D. 103, 109 (N.D. Tex. 1998)). "The status of the subpoena recipient as a non-party is also a factor that can weigh against disclosure in the undue burden inquiry." *Jordan*, 947 F.3d at 1337 (citing *Wiwa*, 392 F.3d at 818).

### B. Analysis

As to the first *Wiwa* factor, the specific relevance of the information in the Supervisor's possession is tenuous. In the Motion, the Supervisor asserts that the requested information is not relevant. (ECF No. 1 at 19). In their Response, Respondents point to evidence in the public record about Dominion's vote tabulation systems that purportedly establish Respondents' reasonable

---

documents and information responsive to Requests 4(a) and 4(b). Respondents also did not object to the Supervisor's request for reasonable costs associated with that production.

[8] Under Rule 45(f), "[w]hen the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45(f). At oral argument, the Supervisor consented to transfer of the instant Motion to the United States District Court for the District of Columbia. However, in light of the Supervisor's subsequent request at the hearing for a ruling that day, I construed that request as non-consent to transfer.

basis to pursue the requested information, generally. For example, the Response identifies Dominion's ImageCast X equipment, and D-Suite 5.5-B and D-Suite 5.5-C software, as containing vulnerabilities or anomalies, thus providing a reasonable basis for the information sought from the Supervisor, as that information purportedly bears on the truth or falsity of Mr. Lindell's statements. (ECF No. 13 at 4–5, 16–18). However, at oral argument, the Supervisor proffered that Monroe County does not use this particular equipment or software, and instead uses "ImageCast Evolution" equipment, in addition to software that is several versions out of date. This proffer is supported by the Voting System Agreement attached to the Motion, (ECF No. 1-3), which identifies the Supervisor's equipment as the ImageCast Evolution system. While the Subpoena appears to appreciate there are different Dominion hardware systems in use, *see* (ECF No. 22-1 at 4–5), the particular equipment and software that the Supervisors uses, which has not been identified as containing vulnerabilities, weakens a finding that the information the Supervisor actually possesses is relevant, irrespective of whether the information sought, generally, is relevant.

However, it is not my finding that the information Respondents seek is irrelevant, and I make no finding as to the relevance of the information sought. Rather, it is my finding that the information the Supervisor *possesses* is of tenuous relevance. Indeed, as the Supervisor argued at oral argument, there appears to be a difference between what she possesses and what Respondents assert that information will support as evidence. Accordingly, I find that the first factor does not weigh in favor of either side. *See Jordan*, 947 F.3d at 1342 (stating that "the relevance of the requested information to the underlying litigation, or the lack thereof, is important").

I nonetheless turn to Respondents' need for the information sought. As to the second factor, Respondents' need for the information sought from the Supervisor is here diminished. Indeed, Respondents have served subpoenas identical to that here on at least 39 other Dominion

customers. *See* Memorandum in Support of Plaintiff's Motion for Protective Order Regarding Third Party Subpoenas, *US Dominion, Inc. et al. v. My Pillow, Inc. et al.*, Case No. 1:21-cv-00445-CJN (D.D.C. Sept. 30, 2022), (ECF No. 145-1 at 4 n.2). Further, the United States District Court for the District of Columbia has entered a protective order governing the production of confidential information. *See* Protective Order Governing the Production and Exchange of Confidential Information, *US Dominion, Inc. et al.*, Case No. 1:21-cv-00445-CJN (D.D.C. Dec. 6, 2022), (ECF No. 152). Thus, whatever need Respondents have for the information sought in the Subpoena, the need for the information the Supervisor possesses is diminished in light of the 38 other identical non-party subpoenas.

Next, I turn to the burden compliance would impose on the Supervisor. Regarding the third *Wiwa* factor, the breadth of the documents requested is indisputably voluminous. Relatedly, and dovetailing with the fourth factor, the Subpoena is overbroad, in part. In Request 1, Respondents seek, from a non-party, "forensic images of every computer drive and memory device that is part of the voting system and every piece of hardware that is part of or used by the voting system." (ECF No. 1-5 at 2 ¶ 6) (summarizing Request 1). In Request 2, Respondents seek, without specifying any time period, forensic copies of specific file formats generated from tabulators and ballot marking devices, in addition to "all data related to the November 2020 Election subject to the 22-month voter records retention requirement under U.S. federal law."[9] (ECF No. 22-1 at 6). As to this request, the Subpoena is overbroad. And in Request 3, which at oral argument Respondents confirmed is contingent on receiving productions responsive to Requests 1 and 2, Respondents seek a complete network map of the Supervisor's Dominion election tabulation

---

[9] At oral argument, the source of this retention requirement was questioned, as the Supervisor represented that she was unaware of any requirement that would require her to preserve forensic images of the machines and computer systems for 22 months following an election. Respondents' counsel similarly could not identify what authority would impose the retention requirement implied by the subpoena request.

system, digital addresses for the hardware, network logs (again, not time-limited), log-in credentials to bypass encryption services, and a list of personnel who had access to the network from January 1, 2019 through November 30, 2020. (*Id.*).

Because the Supervisor's Dominion election equipment has been used in elections since the November 2020 general election time, I questioned the Parties whether forensic images and copies of the relevant drives and systems requested in Requests 1 and 2, from the time of the November 2020 general election, could even be created or whether, by virtue of their subsequent use, the drives will have necessarily changed. Because counsel for Respondents explained that what is sought is an image of the drives *as they were* immediately following the 2020 general election, the Supervisor could not represent that the data would still exist. The Supervisor proffered that she could not, without hiring an outside service, determine whether she can create the forensic images and copies from the time period requested. The expense of attempting to collect the responsive data—indeed, of even determining whether it would be possible to collect that data—is unquestionably burdensome. Moreover, Respondents' counsel agreed that images that fail to accurately reveal the status of data following the election would not be relevant to the defenses advanced. The information sought is, essentially, a digital copy of a non-party's entire election system. And in this regard, the Supervisor's status as a non-party is relevant. *Jordan*, 947 F.3d at 1337 (citing *Wiwa*, 392 F.3d at 818). I afford the Supervisor's non-party status great weight in light of the voluminous information requested.

Finally, while the Subpoena describes the documents requested with particularity, the burden imposed in complying with Requests 1–3 is otherwise undue. The Motion is premised, in part, on the burden compliance would impose coinciding with the Supervisor's preparation for and administration of the 2022 general election leading up to and during early-November 2022. That

election has since passed and, as noted above, Respondents consented at oral argument to an extension of time to comply with Requests 4(a) and 4(b). Accordingly, I recognize that the burden has diminished since the filing of the instant Motion.

However, the Supervisor attested that her office employs only nine people, none of whom possess the technical knowledge or expertise required to generate productions responsive to Requests 1, 2, and 3(a)–(d). (ECF No.1-4 at 2–3 ¶ 7). Thus, to comply with Requests 1, 2, and 3(a)–(d), the Supervisor would have to incur the expense of outside computer experts, which she represents "would probably be Dominion"; although, the Supervisor did not provide the estimated cost of compliance. (*Id.* at 3 ¶ 8). In any event, the Supervisor further attested that she likely will have to replace her election system if that system's network maps and drives are disclosed, either to ensure that the system is not hacked or to restore public confidence in the system. (*Id.* at 3 ¶¶ 8–9). There has been no proffer advanced to discredit this attestation. The concern is not unreasonable in light of the special importance placed on cybersecurity surrounding election systems, which both sides recognize, and the potential handling or disclosure of the requested information should the District of Columbia Case proceed to dispositive pretrial motions or public trial.[10] While the Supervisor has not adduced evidence of the cost of replacing the election system, review of the Voting System Agreement attached to the Motion reveals that, in 2013 when the Supervisor licensed her system from Plaintiffs, the system cost more than $700,000.00. (ECF No. 1-3 at 12). That cost, in 2022, likely remains high.

A similar argument regarding the cost of complying with a subpoena, and the potential need to replace and/or recertify an election system if required to produce the forensic images and

---

[10] At this time, the court in the District of Columbia Case has separately ordered the Parties to provide supplemental briefing on the effect, if any, of the protective order on the disclosure of any information sought through third-party subpoenas. *See* December 8, 2022 Minute Order, *US Dominion, Inc. et al.*, Case No. 1:21-cv-00445-CJN (D.D.C. Dec. 8, 2022). That supplemental briefing was filed on December 16, 2022.

13

network maps requested, was raised in support of quashing a subpoena identical to that here, served by Respondents on the Kent County Clerk in Michigan. *See Lyons v. My Pillow, Inc. et al*, No. 1:22-cv-01191-HYJ-PJG (W.D. Mich. Nov. 29, 2022), ECF No. 1-1 at 9–10. That subpoena was recently quashed by the United States District Court for the Western District of Michigan.[11] *See* Order, *Lyons*, No. 1:22-mc-00107-PJG, ECF No. 16.

For these reasons, I find that the burden imposed by the Subpoena is high.

I am not persuaded by Respondents' argument that courts have previously ordered the disclosure of election system software. When asked at the hearing whether any court had ever done so, Respondents pointed to *Dominion Voting Systems, Inc. v. Wisconsin Elections Commission*, 944 N.W.2d 357, 392 Wis. 2d 382 (Wis. Ct. App. 2020). However, that case involved an appeal regarding the scope of an administrative agency's proposed confidentiality and nondisclosure agreement that would permit a candidate's campaign to gain access to software components of a voting system used in the November 2016 general election, pursuant to the campaign's statutory right to do so under Wisconsin law. 944 N.W.2d 357, 392 Wis. 2d 382 at ¶¶ 3–4 (citing Wis. Stat. § 5.905(4)).

Respondents also pointed to United States District Judge Amy Totenberg's August 11, 2022 Order in *Curling v. Raffensperger*, No. 1:17-cv-02989-AT (N.D. Ga.), ECF No. 1453. There, among other things, the court denied Respondents' motion to intervene in the Northern District of Georgia so that Respondents could gain access to an expert report filed under seal in that court, for use in support of Respondents' defense in the District of Columbia Case. Respondents characterize the expert report as providing a "roadmap explaining how to hack election equipment," and argue that forensic copies of the Supervisors entire election system plus network maps "certainly" should

---

[11] That Order has been appealed to the District Court Judge.

be produced in litigation with appropriate protections if the roadmap to hack that system can be produced in litigation. (ECF No. 13 at. at 10) (emphasis omitted). The Court is not convinced. If anything, the argument runs in the other direction. Accordingly, neither case advanced by Respondents militates against quashing the Subpoena.

For all these reasons, weighing the tenuous relevance of the information in the Supervisor's possession, Respondents' diminished need for the information sought from the Supervisor, the high burden on the Supervisor of compliance, and considering the Supervisor's status as a non-party, I find that the burden on the Supervisor of complying with Requests 1 through 3 is undue. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv).

### IV.    CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** that:

(1) The Motion to Quash Rule 45 Subpoena and Incorporated Memorandum of Law (ECF No. 1), filed by Movant R. Joyce Griffin, Supervisor of Elections for Monroe County, Florida, is **GRANTED, in part**;

(2) The Subpoena served upon the Supervisor is **QUASHED, in part**, with respect to Requests 1, 2, and 3 of the Subpoena; and,

(3) The time to produce documents responsive to Requests Nos. 4(a) and 4(b) is extended to **January 11, 2023**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 20th day of December, 2022.

_____
LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE